No. 15-1551

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

THE SHANE GROUP, ET AL.,

*Plaintiffs-Appellees,*

v.

BLUE CROSS BLUE SHIELD OF MICHIGAN,

*Defendant-Appellee*,

CHRISTOPHER ANDREWS,

*Objector-Appellant*

SCOTT MANCINELLI,

*Objector-Appellant*,

ADAC AUTOMOTIVE, ET AL.,

*Objectors-Appellants*.

_____

On Appeal from the United States District Court
for the Eastern District of Michigan, Southern Division,
No. 02:10-cv-14360-DPH-MKM

_____

**BRIEF OF PLAINTIFFS-APPELLEES**

_____

Daniel A. Small
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Avenue NW
Suite 500
Washington, D.C. 20005
(202) 408-4600

E. Powell Miller
THE MILLER LAW FIRM, P.C.
950 West University Drive, Suite 300
Rochester, Michigan 48307
(248) 841-2200

Daniel E. Gustafson
Daniel C. Hedlund
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 333-8844

Fred T. Isquith
Theodore B. Bell
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC
270 Madison Avenue
New York, New York, 10016
(212) 545-4690

*Counsel for Plaintiffs-Appellees*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 15-1551 _____    Case Name: Shane Group v. Blue Cross Blue Shield

Name of counsel: E. Powell Miller _____

Pursuant to 6th Cir. R. 26.1, Shane Group, Inc., Appellee _____
                                              *Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the
    identity of the parent corporation or affiliate and the relationship between it and the named
    party:

    No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
    in the outcome? If yes, list the identity of such corporation and the nature of the financial
    interest:

    No.

CERTIFICATE OF SERVICE

I certify that on _____ September 23, 2015 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

                    s/ E. Powell Miller _____
                    _____
                    _____

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS ............................................... ii
TABLE OF AUTHORITIES ................................................................................. v
STATEMENT OF ISSUES FOR REVIEW ............................................................ 1
STATEMENT REGARDING ORAL ARGUMENT .......................................... xii
STATEMENT OF THE CASE ............................................................................... 2
STATEMENT OF FACTS ...................................................................................... 4
    I.      Litigation History ................................................................................ 4
    II.     Settlement.............................................................................................. 6
    III.    Exclusions and Objections................................................................. 10
          A.     Scott Mancinelli.................................................................. 11
          B.     Varnum Objectors ............................................................... 11
          C.     Christopher Andrews ........................................................... 12
    IV.    Fairness Hearing and Settlement Approval...................................... 15
          A.     Motion to Intervene ............................................................ 15
          B.     Final Approval .................................................................... 16
          C.     Attorneys' Fees and Expenses ............................................ 17
          D.     Service Awards ................................................................... 18
STANDARD OF REVIEW ................................................................................... 19
ARGUMENT ........................................................................................................ 20
    I.      The District Court Did Not Abuse Its Discretion In Approving the
          Settlement........................................................................................... 23
    A.     The District Court Correctly Found the Settlement Fair,
          Reasonable and Adequate .................................................................. 23
          1.     There Is No Dispute That a 25% Recovery Is Fair, Reasonable,
                and Adequate....................................................................... 23
          2.     There Is No Reason to Doubt Dr. Leitzinger's Estimate.......... 25
          3.     The Objectors' Analyses of the UAW Factors Are Meritless .. 28
                a.     Likelihood of Success on the Merits ............................. 28
                b.     Complexity, Expense, and Duration.............................. 30
                c.     The Amount of Discovery ............................................. 31

   d.  The Opinions of Class Counsel and the
      Named Plaintiffs ............................................................32

   e.  Reaction of Absent Class Members ...............................34

   f.  The Public Interest.........................................................37

   g.  Risk of Fraud and Collision............................................37

   h.  Preferential Treatment ...................................................39

  B.  The District Court Correctly Found the Plan of Allocation and Cy
     Pres Provision Fair, Reasonable, and Adequate ..................................41

  C.  The District Court Did Not Abuse Its Discretion in Determining the
     Notice Was the Best Practicable Notice.............................................44

  D.  The District Court Did Not Abuse Its Discretion in Approving the
     Claims Process ..................................................................................46

II.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
   AWARDING ATTORNEYS' FEES, EXPENSES, OR SERVICE
   AWARDS ...................................................................................................48

  A.  Attorneys' Fees and Expenses.........................................................48

  B.  The District Court Did Not Abuse Its Discretion in Awarding Service
     Awards...............................................................................................53

III.  THE OBJECTORS ARE NOT REPRESENTATIVE OF CLASS
    MEMBERS .................................................................................................55

  A.  The Varnum Objectors Are Embroiled in Litigation with BCBSM ...55

  B.  Mr. Andrews Is a Professional Objector Who Tried to Extort
     $150,000 from Class Counsel ..........................................................56

IV.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
    DENYING THE MOTION TO INTERVENE ...........................................59

V.  CONCLUSION...........................................................................................62

CERTIFICATE OF COMPLIANCE...................................................................78

CERTIFICATE OF SERVICE ...........................................................................80

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS .............82

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allstate Ins. Co. v. Glob. Med. Billing, Inc.*,
    520 F. App'x 409 (6th Cir. 2013)..................................................36

*Baker v. Dolgencorp, Inc.*,
    818 F. Supp. 2d 940 (E.D. Va. 2011)...........................................62

*Barnes v. City of Cincinnati*,
    401 F.3d 729 (6th Cir. 2005) ........................................... 20, 49-50

*Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*,
    46 F.3d 1392 (6th Cir. 1995) ........................................................52

*Blount-Hill v. Zelman*,
    636 F.3d 278 (6th Cir. 2011) .......................................................16

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) .....................................................................35

*Bowling v. Pfizer, Inc.*,
    102 F.3d 777 (6th Cir. 1996)........................................................19

*Bronson v. Bd. of Educ.*,
    604 F. Supp. 68 (S.D. Ohio 1984)................................................31

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) .....................................................................29

*Capitol Park Ltd. Dividend Hous. Ass'n v. Jackson*,
    202 F. App'x 873 (6th Cir. 2006)..................................................50

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)..........................................................60

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n,*
        No. 98-cv-479, 2008 WL 906031 (W.D. Mich. Mar. 31, 2008).........52

*County of Suffolk v. Long Island Lighting Co.,*
        907 F.2d 1295 (2d Cir. 1990).............................................................24

*D'Amato v. Deutsche Bank,*
        236 F.3d 78 (2d Cir. 2001)................................................................60

*Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n,*
        3 F.3d 1568 (D.C. Cir. 1993)............................................................38

*Dick v. Sprint Commc'ns Co.,*
        297 F.R.D. 283 (W.D. Ky. 2014)......................................................35

*Farinella v. Paypal, Inc.,*
        611 F. Supp. 2d 250 (E.D.N.Y. 2009)..............................................60

*Foster v. Barilow,*
        6 F.3d 405 (6th Cir. 1993)................................................................25

*Franks v. Kroger Co.,*
        649 F.2d 1216 (6th Cir. 1981)....................................................19, 45

*Geier v. Alexander,*
        801 F.2d 799 (6th Cir. 1986)............................................................61

*Granada Invs., Inc. v. DWG Corp.,*
        962 F.2d 1203 (6th Cir. 1992)....................................................28, 37

*Hadix v. Johnson,*
        322 F.3d 895 (6th Cir. 2003)............................................... 18-19, 54

*Hayes v. Harmony Gold Mining Co.,*
        509 Fed. App'x 21 (2d Cir. 2013)...............................................38, 57

*In re BankAmerica Corp. Sec. Litig.,*
        210 F.R.D. 694 (E.D. Mo. 2002) ......................................................61

*In re Black Farmers Discrimination Litig.*,
    953 F. Supp. 2d 82 (D.D.C. 2013) ......................................................38

*In re Cardinal Health Inc. Sec. Litig.*,
    528 F. Supp. 2d 752 (S.D. Ohio 2007)................................................50

*In re Domestic Air Transp. Antitrust Litig.*,
    144 F.R.D. 421 (N.D. Ga. 1992)................................................. 61-62

*In re Dry Max Pampers Litigation*,
    724 F.3d 713 (6th Cir. 2013).................................................. 39-40, 53

*In re Gen. Tire & Rubber Co. Sec. Litig.*,
    726 F.2d 1075 (6th Cir. 1984)...........................................................60

*In re Heritage Bond Litig.*,
    No. 02-ml-1475, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ........41

*In re Lehman Bros. Sec. and ERISA Litig.*,
    1:09-md-02017 (S.D.N.Y. March 20, 2012)......................................13

*In re Linerboard Antitrust Litig.*,
    No. MDL 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004) .............24

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000).............................................................19

*In re Mut. Funds Inv. Litig.*,
    No. 04-md-15863, 2011 WL 1102999 (D. Md. Mar. 23, 2011).........42

*In re Nutella Mktg. & Sales Practices Litig.*,
    3:11-cv-01086 (D.N.J. June 8, 2012).................................................13

*In re Oracle Sec. Litig.*,
    No. 90-cv-0931, 1994 WL 502054 (N.D. Cal. June 18, 1994)...........42

*In re Packaged Ice Antitrust Litig.*,
　　No. 08-MDL-01952, 2011 WL 6209188
　　(E.D. Mich. Dec. 13, 2011) ..............................................................34

*In re PaineWebber Ltd. P'ships Litig.*,
　　171 F.R.D. 104 (S.D.N.Y. 1997).......................................................41

*In re Pharm. Indus. Average Wholesale Price Litig.*,
　　588 F.3d 24 (1st Cir. 2009) ................................................................43

*In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*,
　　268 F. Supp. 2d 907 (N.D. Ohio 2003)..............................................49

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
　　535 F. Supp. 2d 249 (D.N.H. 2007) ...................................................13

*In re Urethane Antitrust Litig.*,
　　768 F.3d 1245 (10th Cir. 2014)..........................................................38

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
　　396 F.3d 922 (8th Cir. 2005)..............................................................61

*Jourdan v. Jabe*,
　　951 F.2d 108 (6th Cir. 1991)..............................................................57

*Kimble v. Marvel Entm't, LLC*,
　　135 S. Ct. 2401, 2412 (2015) ............................................................29

*Ko v. Natura Pet Prods., Inc.*,
　　No. 09-cv-2619, 2012 WL 3945541 (N.D. Cal. Sept. 10, 2012)........49

*Laskey v. UAW*,
　　638 F.2d 954 (6th Cir. 1981)..............................................................34

*Lee v. Ocwen Loan Servicing, LLC*,
　　No. 14-CV-60649, 2015 WL 5449813 (S.D. Fla. Sept. 14, 2015)...............35

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
      551 U.S. 877 (2007) ...........................................................................29

*Lindsey v. Memphis-Shelby Cnty. Airport Auth.*,
      F.3d 1150 (6th Cir. 2000) .................................................................33

*Manners v. Am. Gen. Life Ins. Co.*,
      No. 98-cv-0266, 1999 WL 33581944
      (M.D. Tenn. Aug. 11, 1999) .............................................................49

*McPherson v. Kelsey*,
      125 F.3d 989 (6th Cir. 1997) ...........................................................50

*Missouri v. Jenkins*,
      491 U.S. 274 (1989)..........................................................................50

*Moulton v. U.S. Steel Corp.*,
      581 F.3d 344 (6th Cir. 2009) .....................................................18, 48

*Nachshin v. AOL, LLC*,
      663 F.3d 1034 (9th Cir. 2011) .........................................................43

*O'Keefe v. Mercedes-Benz USA, LLC*,
      214 F.R.D. 266 (E.D. Pa. 2003) ......................................................56

*Olden v. Gardner*,
      294 F. App'x 210 (6th Cir. 2008).................................................20, 32

*Ramey v. Cincinnati Enquirer, Inc.*,
      508 F.2d 1188 (6th Cir. 1974) ............................................... 3, 17-18

*Rawlings v. Prudential-Bache Props., Inc.*,
      9 F.3d 513 (6th Cir. 1993) .........................................................17, 49

*Rodriguez v. West Publ'g Corp.*,
      563 F.3d 948 (9th Cir. 2009) ...........................................................24

*Schulte v. Fifth Third Bank*,

No. 09-cv-6655, 2010 WL 4483975 (N.D. Ill. Nov. 8, 2010).......................35

*Sewell v. Bovis Lend Lease, Inc.*,
    No. 09-cv-6548, 2012 WL 1320124 (S.D.N.Y. Apr. 16, 2012)...................54

*Sheick v. Auto. Component Carrier LLC*,
    No. 09-cv-14429, 2010 WL 4136958 (E.D. Mich. Oct. 18, 2010) ..............31

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
    No. 03-cv-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) ....................24

*Tenn. Ass'n of Health Maint. Orgs. v. Grier*,
    262 F.3d 559 (6th Cir. 2001) ........................................................................60

*UAW v. Gen. Motors Corp.*,
    497 F.3d 615 (6th Cir. 2007) ..........................................................................3

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
    669 F.3d 632 (5th Cir. 2012) ................................................................19, 46

*United States v. Blue Cross Blue Shield of Mich.*,
    No. 10-cv-14155 (E.D. Mich. Oct. 18, 2010) ................................................4

*United States v. City of Detroit*,
    712 F.3d 925 (6th Cir. 2013)........................................................................19

*United States v. Elder*,
    90 F.3d 1110 (6th Cir. 1996)........................................................................58

*United States v. Jackson*,
    180 F.3d 55 (2d Cir. 1999) ..........................................................................57

*United States v. Zannino*,
    895 F.2d 1 (1st Cir. 1990) ............................................................................58

*Varacallo v. Mass. Mut. Life Ins. Co.*,
    226 F.R.D. 207 (D.N.J. 2005) ......................................................................57

*Vassalle v. Midland Funding LLC*,
708 F.3d 747 (6th Cir. 2013)................................. 20, 28, 39-41, 53, 54

*Williams v. Vukovich*,
720 F.2d 909 (6th Cir. 1983).....................................................31, 33, 39

*Wolf v. Red Bull GMBH*,
No. 1:13-cv-08008 (S.D.N.Y. Apr. 21, 2015), ...................................13

*Wong v. Accretive Health, Inc.*,
773 F.3d 859 (7th Cir. 2014)..............................................................57

## Other

Free Clinics of Michigan, *Board of Directors*, www.fcomi.org/board-of-directors.html.

Newberg on Class Actions § 11:20 (4th ed. 2012)

Herbert B. Newberg, *Newberg on Class Actions* § 11.56 (2d ed. 1985)

Wright & Miller, *Fed. Practice & Proc.: Civil*, § 1979

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs believe oral argument is unnecessary under Rule 34(a)(2)(C) because the issues are adequately presented in the briefs. However, if the Court desires oral argument, Plaintiffs are prepared to participate at the earliest opportunity.

## STATEMENT OF ISSUES FOR REVIEW

1.     Did the District Court abuse its discretion in approving a settlement that provided more than 25% of the damages estimated by an experienced economist after extensive discovery but before resolution of class certification, *Daubert*, summary judgment, trial, and appeal, where the District Court explicitly found there were no indications of fraud or collusion?

2.     Did the District Court abuse its discretion in denying objectors' motion to intervene as untimely?

## STATEMENT OF THE CASE

For nearly four years, Plaintiffs and Defendant Blue Cross and Blue Shield of Michigan ("BCBSM") engaged in combative litigation over the impact of most-favored-nation clauses ("MFNs") that BCBSM had negotiated with some Michigan hospitals. After 169 depositions, discovery of millions of pages of documents, analysis of many terabytes of data by dueling economists, motions practice over class certification and *Daubert*, and more than a year of stop-and-start negotiations, Plaintiffs and BCBSM arrived at a settlement that created a common fund of roughly $30,000,000, over 25% of the damages estimated by Plaintiffs' expert economist. The settlement provided direct notice to nearly three million class members and publication notice designed to reach more than 80% of Michigan adults. It established a dedicated hotline with live representatives to answer class members' questions and a claims process that sought to reduce duplicative and fraudulent claims without prohibitively burdening claimants. This is, in Plaintiffs' and Class Counsel's view, an excellent settlement.

Class members largely agreed: despite the extensive notice, only 1,518 potential class members—0.05% of those directly notified—opted out and only four objections were filed, one of which was quickly withdrawn.

2047135.1

The District Court for the Eastern District of Michigan (Hood, J.) also agreed, approving the settlement in a 48-page opinion carefully considering each of the factors laid out by this Court for determining whether a settlement is fair, reasonable, and adequate and for determining a reasonable amount to award to attorneys. RE213, PgID6984-7002 (citing *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007), and *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1194-97 (6th Cir. 1974)). The District Court specifically rejected the objectors' suspicions of fraud or collusion, noting that it "did not observe any signs that the parties were engaged in pretense and posturing during the years in litigation before the Court to mask collusion in reaching a Settlement Agreement." RE213, PgID6990.

Three groups of objectors now appeal this determination, asserting that this is a billion-dollar case that Class Counsel threw away in collusion with BCBSM, perpetrating a massive fraud on the class and the District Court. These scurrilous accusations rest on groundless speculation, misunderstanding or misrepresentation of the facts of this case and the content of the settlement, and misstatements of law. Many of the claims were raised for the first time well after the objection deadline or are newly raised here. Moreover, two of the objections seem driven by individual motives rather than the class's interest: for the Varnum Objectors, a

desire to gain advantage against BCBSM in unrelated litigation, and for Mr. Andrews, a scheme to extort more than $150,000 from Class Counsel. These objections are thus not only meritless but unrepresentative of the views of class members. None show that the District Court abused its discretion.

## STATEMENT OF FACTS

## I.   LITIGATION HISTORY

In October 2010, the Department of Justice ("DOJ") and the State of Michigan ("State") sued BCBSM, alleging it had market power in 34 geographic markets for "the sale of commercial health insurance" and forced MFNs on at least 70 Michigan hospitals, resulting in anticompetitive effects in those specific markets. Complaint ¶¶ 3, 28, 33, 86, *United States v. Blue Cross Blue Shield of Mich.*, No. 10-cv-14155 (E.D. Mich. Oct. 18, 2010) ("Government Case"), ECF No. 1. They did not seek damages or certification of a class.

That same month, the first class action lawsuit related to BCBSM's MFNs was filed. *See* RE1. Unlike the Government Case, this complaint sought overcharge damages on purchases of hospital healthcare services and certification of a class of direct purchasers.

Thereafter, Plaintiffs participated in extensive fact discovery in coordination with the Government Case and a competitor suit brought by Aetna. This discovery

comprised millions of pages of documents, 169 depositions, and years of hospital payment data. *See* RE148, PgID4197. In addition to the parties, numerous third-party hospitals and insurers provided documents and payment data, all subject to protective orders entered by the District Court. *E.g.*, RE47.

As merits discovery neared completion, the State legislature banned such MFNs, leading the DOJ and the State to dismiss their case on March 25, 2013. *See* Gov't Case, ECF. Nos. 240, 245, 246. At this time, class-related fact discovery was incomplete, expert discovery was in its infancy, and class certification and summary judgment had not been briefed. *See* Gov't Case, ECF No. 120.

Plaintiffs continued to litigate after the Government Case's dismissal, proceeding with discovery, expert analysis, and class certification briefing. Plaintiffs retained Ph.D. economist Jeffrey J. Leitzinger to develop and implement a damages model. Dr. Leitzinger has decades of experience analyzing antitrust claims and numerous courts have found his work reliable. *See* RE169, PgID5316 (collecting cases). Dr. Leitzinger's damages estimate is the *only* estimate of the amount that BCBSM's MFNs increased prices. Class Counsel invested over $2.5 million out-of-pocket in Dr. Leitzinger's work, all of which was done for litigation purposes, when Plaintiffs had every incentive to prove maximum damages.

Dr. Leitzinger performed a regression analysis using terabytes of data from

several insurers, covering more than 60 million claims. RE169, PgID5317. He found recoverable, non-trivial damages at only 13 of the 70 hospitals at which BCBSM imposed MFNs—and even at those hospitals, only for 23 particular provider agreements. RE169, PgID5323-24. These damages totaled $118 million. RE169, PgID5324.

After Plaintiffs filed their class certification brief and expert report, BCBSM opposed certification on numerous grounds, filed its own expert report, and moved to exclude Dr. Leitzinger's opinions. It denied that any class members suffered any damages. Both experts were deposed.

## II. SETTLEMENT

Plaintiffs and BCBSM first discussed settlement in early 2013, more than two years into the litigation, but negotiations over the next year were contentious and unproductive. RE169-3, PgID5410-11. BCBSM finally returned to the table in March 2014, leading to an agreement in principle that took three months of arduous negotiations to reduce to writing. RE169-3, PgID5411-12.

The settlement created a common fund of $29,990,000. RE148-1, PgID4228. It allocated this money based on the relative strength of damages claims for different categories of purchases. RE148-1, PgID4289-90. Claims with the greatest likelihood of success—those based on purchases from hospitals with

MFNs where Dr. Leitzinger could quantify damages ("Category 1")—receive 78% of the distribution, with each claim getting a minimum of $25 (subject to a minor exception) and a maximum of 3.5% of the Claimant's total healthcare purchases at all Michigan general acute care hospitals over an 8-year period. RE169, PgID5337. The next group of claims, those based on purchases from hospitals with MFNs for which Dr. Leitzinger could not estimate non-trivial damages ("Category 2"), receive 20% of the distribution, with a $15 minimum and 1% maximum. RE169, PgID5337. The last category, claims for purchases at hospitals without MFNs at all ("Category 3"), were allocated 2% of the distributions; if 100 or more claims were made in this category, a claim smaller than $10 with no Category 1 or 2 purchases would be deemed too small to justify distribution and would be given to a health care charity, Free Clinics of Michigan. RE169, PgID5338. Thus, the lion's share of the recovery was allocated to class members with the highest likelihood of success.

The settlement allowed Class Counsel to petition the District Court for attorneys' fees, reimbursement of costs, and service awards to named plaintiffs, but guaranteed no awards and was not contingent on the District Court's award determinations. RE148-1, PgId4329. Class Counsel petitioned for one-third of the common fund as attorneys' fees, or $9,996,667—less than two-thirds of their lodestar—and reimbursement of litigation expenses of $3,499,893.02. RE155,

PgID4451. They also requested a total of $165,000 in service awards for the eight class representatives, ranging from $5,000 for individuals who responded to discovery requests and produced documents to $45,000 for organizations that produced tens of thousands of documents, sat for 30(b)(6) depositions, produced extensive data, and otherwise expended significant time and resources in the prosecution of the case. RE155, PgID4469-73.

Plaintiffs retained leading notice and claims experts to design and administer notice and claims processes. Advertising and notification specialist Kinsella Media designed a notice plan under which the settlement administrator, Epiq Systems, mailed nearly three million notices to class members. RE148-2, PgID4327-28; RE162-1, PgID4740. Kinsella ran advertisements in 24 print publications and websites providing 29 million impressions, likely reaching 82.9% of Michigan adults an average of 2.2 times per person. RE148-2, PgID4330-34. Working with Class Counsel, Kinsella drafted the notices to "effectively convey the necessary information to Class Members," providing "clear, concise, plain language ... without omitting significant facts that Settlement Class Members need to understand their rights." RE148-2, PgID4335.

The notices directed Settlement Class members to a website and toll-free phone number for additional information and claims forms. Over the next few

months, more than 100,000 individuals visited the website and nearly 85,000 calls were made to the dedicated hotline set up by Epiq, leading to more than 380,000 minutes of call time—including more than 200,000 minutes with live operators trained specifically to answer questions about this particular settlement. RE169-4, PgID5420-21.

Working with Class Counsel, Epiq designed claims forms that sought to balance two goals: ease of submission, and deterrence of fraud or duplicative claims.[1] As originally drafted, the claims forms required documentation of purchases for all submissions. However, after early feedback from class members, Epiq and Class Counsel eliminated that requirement for individual class members early in the notice period. RE169-4, PgID5418. Insurers and self-insured entities were permitted to document their purchases with excerpts from their internal claims databases. RE169-4, PgID5418-19. At all times, Epiq's trained personnel were available to help claimants understand the claim requirements.

The District Court preliminarily approved the settlement on June 26, 2014, finding "the form and method of providing notice" to be "the best practicable under the circumstances" and approving the proposed claims forms. RE151,

---

[1] Duplicative claims were particularly likely here because many hospital bills are split among multiple payors—both the patient and one or more insurers, with the hospital often forgoing part of the stated price as well.

PgID4422-24. The District Court gave class members three months to review the settlement and determine whether to opt out, object, or remain in the class. RE151, PgID4421.

As of October 23, 2014, several weeks before the close of the claims period, 23,916 individuals and 82 insurers and self-insured entities had filed claims, including some of the largest employers, unions, and insurance companies in Michigan. RE169-4, PgID5418.[2]

## III. EXCLUSIONS AND OBJECTIONS

Of the roughly three million class members who received direct notice and the millions more who received publication notice,[3] only 1,511 potential class members opted out (about 0.05% of those who received direct notice). Many of these opt-outs were members of related corporate families, such as the 179 opt-out requests filed by Aetna affiliates.[4]

Four individuals or groups filed valid objections, one of which was withdrawn. The three remaining objections are all the subject of appeals here.

---

[2] Because the claims period closed after the Fairness Hearing, the total number of claims was never entered into the record.

[3] The exact number of class members is unknown. Approximately seven million individuals or entities purchased hospital services during the Class Period, but a significant portion paid nothing because an insurer covered the entire amount.

[4] Aetna had filed its own MFN litigation against BCBSM shortly after Plaintiffs filed their claim, as discussed below.

## A.    Scott Mancinelli

Before the District Court, Mr. Mancinelli made three arguments. First, he criticized the settlement for failing to include injunctive relief, apparently unaware that the State had banned the MFNs at issue in the litigation. RE160, PgID4635-36. Second, he criticized the existence of a *cy pres* recipient. RE160, PgID4636-39. Third, he stated that he did not receive direct notice, instead learning of the settlement from a notice mailed to his daughter at the same address. RE160, PgID4639-40.

## B.    Varnum Objectors

A group of 26 companies represented by Varnum LLP filed a joint objection. Varnum has filed more than 50 suits against BCBSM in unrelated litigation; every one of the 26 objecting companies here is a plaintiff in one or more of those cases.  RE169, PgID5340.

The Varnum Objectors' principal argument was that the settlement fund was inadequate in light of the $85 billion spent on hospital services in Michigan during the class period. The Varnum Objectors believed that the settlement should be compared not against Dr. Leitzinger's damages estimate of $118 million but against a percentage of the $85 billion, or against the lost profits estimated by Aetna in its competitor suit.  RE161, PgID4658-61.  Based largely on their

assertion that this was "a billion dollar case," the documentation requirement in the claims process, and the amount of attorneys' fees and service awards requested by Class Counsel, the Varnum Objectors claimed to see a "risk of fraud and collusion." RE161, PgID4661.

The Varnum Objectors also claimed that they lacked sufficient information to determine whether to object, opt out, or support the settlement because some documents were filed under seal pursuant to the District Court's protective orders. None of the Varnum Objectors contacted Class Counsel to request the documents or otherwise made any effort to obtain any information prior to the objection deadline. Instead, they filed a motion to intervene nearly a month after the objection deadline and just three weeks before the Fairness Hearing, requesting that several documents be unsealed and that the Fairness Hearing be adjourned. RE166. At least 29 third-party hospital systems and insurers ("Hospital and Insurer Intervenors") that had produced documents pursuant to the District Court's protective orders moved to intervene to oppose Varnum's request. RE181, RE183, RE185, RE186, RE189, RE192.

## C.    Christopher Andrews

The final objector, Mr. Andrews, is a serial objector who has objected to

numerous other class action settlements.[5] As one district judge explained, Mr. Andrews is "a professional objector who has extorted additional fees from counsel in other cases through his objections or threats to object, and has ... done so in this case." RE201-4, PgID6491.[6] Prior to filing his objection in this case, he informed Class Counsel that he was preparing an objection but would like to discuss resolving it, and that Class Counsel should "not take what was written as personal, it's all business." RE169-15, PgID5741. Mr. Andrews said he would drop his entire objection if Class Counsel reduced their fee request by $990,000—and paid $153,450 to Mr. Andrews. RE169-15, PgID5744. Otherwise, Mr. Andrews would "send a letter to all judges in this district," file "BAR complaints," and otherwise attempt to damage Class Counsel. RE169-16, PgID5749. Class Counsel refused, after which Mr. Andrews launched an extended barrage of harassing and threatening filings and emails.

On the objection deadline, Mr. Andrews filed an eight-page objection that conclusorily asserted a "grocery store list of issues" without discussing the actual

---

[5] *See, e.g.*, *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007); *Wolf v. Red Bull GMBH*, No. 1:13-cv-08008 (S.D.N.Y. Apr. 21, 2015), ECF No. 55; *In re Nutella Mktg. & Sales Practices Litig.*, 3:11-cv-01086 (D.N.J. June 8, 2012), ECF. No. 78; *In re Lehman Bros. Sec. and ERISA Litig.*, 1:09-md-02017 (S.D.N.Y. March 20, 2012), ECF No. 839.

[6] *See also* RE169-18, PgID5757 ("He tried to extort a fee from us."); *Tyco*, 535 F. Supp. 2d at 262 (noting that Mr. Andrews had withdrawn his objection after being compensated by lead counsel).

2047135.1

case or settlement in any detail. RE159, PgID4630. Two weeks later he filed an untimely 220-page "supplement," in which he accused Class Counsel of colluding with BCBSM, engaging in "blatant theft of class funds and a possible fraud on the Court," "intentionally inflated" and "high on meth" billing, "malpractice," and similar egregious misconduct. RE163, PgID4796; RE163-1, PgID4828, PgID4886, PgID4892. Andrews asserted that "some people [i.e., Class Counsel] belong in jail" and requested that Class Counsel be sanctioned. RE163, PgID4798; RE163-1 PgID4834, PgID4838. Mr. Andrews asserted that the settlement should have been "many multiples" larger and that Class Counsel overcharged the class by $5.4 million.  RE163, PgID4794; RE163-3, PgID4962.

Mr. Andrews' oversized, untimely filings continued for months thereafter. All told, he filed 10 separate attacks on Class Counsel and the settlement. RE159; RE163; RE172; RE179; RE202; RE204; RE205; RE207; RE209; RE210. At the same time, he sent Class Counsel dozens of emails, many of them containing personal and professional threats and baseless accusations. RE208-1, PgID6702-6906. He promised to make the fairness hearing "full of fireworks"; he warned that "counsel risks losing everything at any time"; he repeatedly threatened to file bar complaints, intervene in Class Counsel's other cases, or send his scurrilous claims to media outlets and judges throughout Michigan. RE208-1, PgID6734, PgID6761,

PgID6770, PgID6776, PgID6847. In the most egregious (and most clearly extortionate) example, he informed Class Counsel that they should "have a check ready for me to pick up or be delivered by Tuesday 5:00 pm *regardless of how the Court rules*. If not it will get much worse when I take further action starting on Wednesday." RE206-1, PgID6638 (emphasis added).

When the District Court approved the settlement and rejected the objections, it specifically found "that many of [Mr. Andrews'] submissions are not warranted by the law and facts of the case, were not filed in good faith and were filed to harass Class Counsel." RE213, PgID7014.

## IV. FAIRNESS HEARING AND SETTLEMENT APPROVAL

The District Court held a fairness hearing on November 12, 2014. Mr. Andrews and counsel from Varnum LLP spoke at the hearing; Mr. Mancinelli did not attend. Representatives from many of the Hospital and Insurer Intervenors also attended the hearing.

On March 31, 2015, the District Court issued a 48-page opinion denying Varnum's motion to intervene, approving the settlement, and awarding attorneys' fees, expenses, and service awards. RE213.

### A. Motion to Intervene

First, the District Court considered the Varnum Objectors' motion to

intervene to unseal records and adjourn the fairness hearing. RE213, PgID6972-79. The District Court denied the motion as untimely under *Blount-Hill v. Zelman*, 636 F.3d 278, 283-84 (6th Cir. 2011), considering the stage of the case; the purpose of intervention; the length of time the Varnum Objectors knew of their interests; the prejudice to both the original parties and the many Hospital and Insurer Intervenors; and the unusual circumstance that millions of class members' personal, medical, insurance, and business information was implicated. RE213, PgID6974-78. It therefore denied the Varnum Objectors' attempt to intervene and their corresponding request to adjourn the Fairness Hearing. RE213, PgID6978-79.

## B.    Final Approval

Next, the District Court outlined the various objections and, applying the seven *UAW* factors, found the settlement fair, reasonable, and adequate. RE213, PgID6980-84. It spent the most time on the objectors' assertion of a "substantial risk of fraud and collusion." RE213, PgID6985-90. The court found "no indication of fraud or collusion in this case." RE213, PgID6989. Rather, "[e]ach party vigorously advanced and defended their arguments and positions before the Court," and "[t]he Court did not observe any signs that the parties were engaged in pretense and posturing during the years in litigation before the Court to mask collusion in reaching a Settlement Agreement with Blue Cross." RE213,

PgID6989-90. It specifically noted that Class Counsel "vigorously argued each of their positions before the Court." RE213, PgID6990.

The District Court similarly found that the other six *UAW* factors weighed in favor of approval and that the settlement neither gave preferential treatment to the class representatives nor gave merely perfunctory relief to absent class members. RE213, PgID6991-7000. It then evaluated the plan of allocation, concluding that it was fair, reasonable, and adequate to structure the settlement so that "the stronger claims receive more than the other claims where damages are less." RE213, PgID7001-02. Accordingly, it approved the settlement.

## C. Attorneys' Fees and Expenses

The District Court next determined a reasonable amount of attorneys' fees under the percentage-of-the-fund approach recommended by this Court. RE213, PgID7703-04 (citing *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 515-16 (6th Cir. 1993)). It observed that the requested one-third percentage was within the range found reasonable by district courts within this circuit and that it resulted in an award more than $5 million *less* than Class Counsel's lodestar. RE213, PgID7003-05.

The District Court then applied the six-factor *Ramey* test and found that a one-third percentage appropriately compensated Class Counsel for their services to

the class. RE213, PgID7006-08 (citing *Ramey*, 508 F.2d at 1194-97). Accordingly, it awarded one-third of the settlement fund to Class Counsel.

The District Court then considered Class Counsel's request for reimbursement of their litigation expenses of $3,499,893.02. RE213, PgID7008-10. It found the request "reasonable, in light of the time, resources, expert analysis and complexity of this class case," particularly in light of the necessity and cost of "the assistance of qualified experts ... in antitrust litigation" and the complexity of the analysis in this case. RE213, PgID7009-10.

## D. Service Awards

Finally,[7] the District Court considered Plaintiffs' request for service awards (also known as "incentive awards") for the individuals and organizations who represented the class as named plaintiffs. RE213, PgID7010-13. The District Court observed that "[p]ayment of incentive awards to class representatives is a reasonable use of settlement funds" and that the amounts requested were in line with awards granted in similar cases. RE213, PgID7011-12 (citing *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003), and *Moulton v. U.S. Steel Corp.*, 581

---

[7] The District Court also considered and denied cross-motions for sanctions filed by Mr. Andrews and Plaintiffs, although it noted that Class Counsel could pursue their claim that some of Mr. Andrews's communications amounted to extortion "with the appropriate authorities." RE213, PgID7013-15. Neither Mr. Andrews nor Class Counsel appealed these rulings.

2047135.1

F.3d 344, 351 (6th Cir. 2009)). It then considered the efforts undertaken by each of the organizations and individuals that served as class representatives, commenting on their document productions, their role in drafting and responding to discovery requests, the industry knowledge they shared with Class Counsel, their depositions, and other elements of their participation in the litigation. RE213, PgID7012-13. Based on this participation, it found the requested awards reasonable and awarded them to each named plaintiff.

## STANDARD OF REVIEW

The District Court's findings are reviewed for abuse of discretion. *See UAW*, 497 F.3d at 625 (settlement approval); *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996) (attorneys' fees and awards); *Hadix*, 322 F.3d at 897 (incentive awards);[8] *Franks v. Kroger Co.*, 649 F.2d 1216, 1223 (6th Cir. 1981) (notice); *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 641 (5th Cir. 2012) (claims process); *United States v. City of Detroit*, 712 F.3d 925, 930 (6th Cir. 2013) (timeliness of intervention).

---

[8] *Hadix* held that the *denial* of an incentive award was reviewed for abuse of discretion, citing favorably a case reviewing a *grant* for abuse of discretion. 322 F.3d at 897 (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000)). There is no reason to subject the mirror-image rulings to different standards of review.

2047135.1

In many of these areas, the appellate court's review is particularly deferential. A district court has "wide discretion" in applying the *UAW* factors to determine whether a settlement should be approved, *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755 (6th Cir. 2013), and in awarding attorneys' fees, *Barnes v. City of Cincinnati*, 401 F.3d 729, 746 (6th Cir. 2005). Because "[t]he district court is much nearer to [the] case than" the appellate court, this Court affirms settlement approval "where the balance is close." *Olden v. Gardner*, 294 F. App'x 210, 220 (6th Cir. 2008).

## ARGUMENT

The District Court's rulings clearly were within its discretion. The settlement achieved a large recovery that appropriately reflected the many obstacles Plaintiffs faced before they could hope to achieve a final litigated victory. The District Court ordered extensive notice and a reasonable claims process, designed by reputable experts with no incentive to betray the class. And the District Court was uniquely well positioned to evaluate the reasonableness of the settlement and the appropriateness of awards to Class Counsel and the Class Representatives, given its years of management of the litigation and its access to all relevant documents in the case. Under the appropriate standard of review, there is no basis for overturning the District Court's considered exercise of its discretion—and, indeed, the

objectors barely pay lip service to that standard, effectively disputing all issues *de novo*.

Arguing against the District Court's explicit finding of "no indication of fraud or collusion in this case," RE213, PgID6989, the objectors posit that Class Counsel and their expert economist, against their professional and financial interests, colluded with BCBSM to undervalue the case. They claim that Dr. Leitzinger rigged his analysis to show just $118 million in damages, when in actuality this was a "slam dunk" case worth "billions of dollars." *E.g.*, Varnum Br. at 3; RE163-3, PgID4939. This breathtaking allegation is based on a complete misunderstanding of the facts of the case. The yardsticks the objectors use to show the supposed billion-dollar potential are simply irrelevant. They presume that every purchase from every hospital in Michigan for 8½ years contained a measurable overcharge, which was never alleged and could never be shown.

Moreover, the massive fraudulent scheme the objectors have dreamed up is nonsensical. Class Counsel and Dr. Leitzinger would have to be crooked enough to cook up a rigged expert report underestimating damages, in a case where Class Counsel were supposedly in line for a landmark judgment that would earn them a substantial percentage of a billion-dollar recovery. This suggestion—that Class Counsel and Dr. Leitzinger would jeopardize reputations they have spent decades

building while simultaneously hurting their own financial interests—is as illogical as it is insulting. Moreover, the settlement guaranteed Class Counsel *nothing*, placing fees and reimbursement of expenses entirely in the District Court's discretion.

Finally, the denial of the Varnum Objectors' motion to intervene to unseal documents was plainly correct and, at a minimum, well within the District Court's discretion. The Varnum Objectors do not even dispute the basis for the denial: that their motion to intervene was untimely. Despite claiming they needed the documents "in order to determine whether to participate in the settlement, object, or opt out," Varnum Br. at 12, the Varnum Objectors made no attempt to obtain the documents prior to the objection and opt-out deadline—instead determining to object and then belatedly claiming that they lacked the information to decide whether to do so. Even if the District Court abused its discretion in finding the motion untimely (which, again, the Varnum Objectors do not claim), there was no basis for the requested relief. This Court and many others have repeatedly denied discovery to objectors. *See infra* pp. 60-62.

Accordingly, the District Court's opinion should be affirmed in full.

# I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN APPROVING THE SETTLEMENT

## A.    The District Court Correctly Found the Settlement Fair, Reasonable, and Adequate

### 1.    There Is No Dispute That a 25% Recovery Is Fair, Reasonable, and Adequate

As outlined above, the settlement created a common fund of roughly $30 million, more than 25% of the $118 million in damages estimated by a highly experienced and reputable economist. The distribution plan reflects the expected recoveries of class members with different purchases. Roughly three million class members received notices drafted by a notice specialist, and a leading claims administrator designed and oversaw a claims process intended to facilitate legitimate claims while filtering out duplicative or fraudulent claims. The settlement was not contingent on any award to Class Counsel or the class representatives, leaving such awards wholly in the discretion of the District Court.

This is, in other words, a perfectly reasonable class-action settlement. As even the Varnum Objectors concede, "[a]t first blush, this appears to be a reasonable compromise of the lawsuit." Varnum Br. at 19. The District Court's analysis went well beyond first blush, providing reasoned factual findings on each *UAW* factor and carefully examining whether named plaintiffs received improper preferential treatment. Without the objectors' claims of a pervasive fraud

35

# I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN APPROVING THE SETTLEMENT

## A.    The District Court Correctly Found the Settlement Fair, Reasonable, and Adequate

### 1.    There Is No Dispute That a 25% Recovery Is Fair, Reasonable, and Adequate

As outlined above, the settlement created a common fund of roughly $30 million, more than 25% of the $118 million in damages estimated by a highly experienced and reputable economist. The distribution plan reflects the expected recoveries of class members with different purchases. Roughly three million class members received notices drafted by a notice specialist, and a leading claims administrator designed and oversaw a claims process intended to facilitate legitimate claims while filtering out duplicative or fraudulent claims. The settlement was not contingent on any award to Class Counsel or the class representatives, leaving such awards wholly in the discretion of the District Court.

This is, in other words, a perfectly reasonable class-action settlement. As even the Varnum Objectors concede, "[a]t first blush, this appears to be a reasonable compromise of the lawsuit." Varnum Br. at 19. The District Court's analysis went well beyond first blush, providing reasoned factual findings on each *UAW* factor and carefully examining whether named plaintiffs received improper preferential treatment. Without the objectors' claims of a pervasive fraud

35

underpinned by a phony damage estimate, there is no serious ground for questioning the District Court's exercise of discretion. A 25% recovery is solidly within the range of settlements approved by district courts throughout the country. *See, e.g.*, *In re Linerboard Antitrust Litig.*, No. MDL 1261, 2004 WL 1221350, at *4 (E.D. Pa. June 2, 2004) (collecting antitrust cases in which courts approved settlements of 5.35% to 28% of single damages); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-cv-4578, 2005 WL 1213926, at *9 (E.D. Pa. May 19, 2005) (recovery of 11.4% of damages "compares favorably with the settlements reached in other complex class action lawsuits").

Indeed, the objectors did not dispute below that the settlement provides reasonable value if Dr. Leitzinger's $118 million estimate is accepted. The Varnum Objectors now argue that that estimate should be trebled before being compared to the common fund. Varnum Br. at 22-23. This is squarely contrary to well-established practice. In determining the adequacy of an antitrust settlement, "it is inappropriate to measure the adequacy of a settlement amount by comparing it to a possible trebled base recovery figure." *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1324 (2d Cir. 1990).[9] Moreover, neither the Varnum Objectors

---

[9] *See also, e.g.*, *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009) ("[C]ourts do not traditionally factor treble damages into the calculus for determining a reasonable settlement value.").

nor any other objector made this argument in their briefs below, and thus it is waived. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008).[10]

2. <u>There Is No Reason to Doubt Dr. Leitzinger's Estimate</u>

Perhaps recognizing the reasonableness of the recovery as a percentage of the estimated damages, the Varnum Objectors and Mr. Andrews claim that Dr. Leitzinger's finding of $118 million in damages could not be reasonable. They principally argue that the damages must be higher in light of the total amount spent on hospital services in all of Michigan during the class period. RE161, PgID4656-60.

The objectors' $850 million number (1% of $85 billion) is based on fundamental misunderstandings and irrelevant premises. This case is about provable damages caused by BCBSM's MFNs, not an arbitrary fraction of the total cost of hospital care in Michigan for 8½ years. The objectors mistakenly begin with the amount spent at *all* hospitals in Michigan. Varnum Br. at 6. This includes not just general acute care hospitals—the only type of hospital relevant to this case—but long-term acute care hospitals, rehabilitation hospitals, psychiatric

---

[10] Although the court can deviate from the general waiver rule "in 'exceptional cases or particular circumstances' or when the rule would produce a 'plain miscarriage of justice,'" it has "rarely exercised such discretion." *Flowers*, 513 F.3d at 552 (quoting *Foster v. Barilow*, 6 F.3d 405, 409 (6th Cir. 1993)). The objectors assert no reason to make an exception for any of their waived arguments.

hospitals, and other types of specialty hospitals. They then ignore that BCBSM imposed MFNs at barely *half* of the general acute care hospitals in Michigan. On top of that, they assume that damages accrued at all hospitals throughout the entire class period, even though BCBSM imposed MFNs at different times for different time periods, and the MFNs forced increases in competitors' reimbursement rates at various times after their imposition.

The amount of *all* purchases at *all* hospitals of *all* types at *all* times is thus entirely irrelevant. Yet the Varnum Objectors do not grapple with any of these significant facts. The $85 billion figure they assert may allow them to imagine jaw-dropping damages, but it has no use in an actual damages analysis related to BCBSM's MFNs.

The objectors also concoct theories as to the percentage by which hospital payments were inflated as a result of the MFN scheme. They get their 1% argument from the 1% cap in the plan of allocation, claiming that it is "the parties' own agreed-upon refund amount." Varnum Br. at 15; Mancinelli Br. at 11. But neither party ever put forward the cap as an estimate of the overcharge percentage; it simply facilitates equitable distribution among claimants. The objectors' 16% argument relies on a provision in BCBSM's provider agreements with some hospitals in Michigan that provides a penalty for "declin[ing] to enter into these

agreements." RE72, PgID886. This penalty provision has no conceivable relationship to class damages. Moreover, the 16% argument was never made below and is waived. *See Flowers*, 513 F.3d at 552.

The Varnum Objectors also cite Aetna's damages estimate in its competitor case against BCBSM. Varnum Br. at 9. But this estimate is based entirely on Aetna's lost profits in the market for commercial group health insurance and diminution of business value, not overcharges on purchases of hospital services. RE161-3, PgID4711-12. Aetna's lost profits in the sale of commercial health insurance say nothing about the amount of overcharges in the sale of hospital services—the only damages a class of direct purchasers of hospital services could seek.

In contrast, Dr. Leitzinger performed a sophisticated econometric analysis based on terabytes of data. He conducted this analysis well before settlement, when Plaintiffs' incentive was to prove the maximum damages consistent with the facts. On any set of facts, courts would look skeptically at a claim that Dr. Leitzinger would jeopardize his reputation and his career to cook up a wholly fraudulent expert report. The irrelevance of the supposed facts offered to support this scurrilous claim shows that it is frivolous.

2047135.1

### 3. The Objectors' Analyses of the *UAW* Factors Are Meritless

Building on their baseless premise that Dr. Leitzinger's estimate should be ignored, the Varnum Objectors reargue the *UAW* factors *de novo*. *See* Varnum Br. at 23-33. The "wide discretion in assessing the weight and applicability" owed to the District Court is nowhere to be found. *Vassalle*, 708 F.3d at 754 (quoting *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992)). But even leaving the standard of review aside, the objectors' analysis is pervasively flawed. The District Court correctly found that every one of the *UAW* factors counseled in favor of settlement.

#### a. *Likelihood of Success on the Merits*

The objectors focus almost exclusively on the fact that the DOJ and State brought suits on the same subject, and that the District Court denied a motion to dismiss. *See, e.g.*, Varnum Br. at 24-25; Andrews Br. at 31-32. They say *nothing* about the obstacles of summary judgment, class certification, *Daubert*, trial, and appeal. Plaintiffs agree that the "evidence of the anti-competitive nature of the MFN Agreements" is strong, Varnum Br. at 25—but like it or not, that is only the beginning of what Plaintiffs must prove. Unlike the DOJ and the State, the Plaintiffs needed to satisfy Rule 23, establish impact and damages, and prove their complex case before a jury. Even if Plaintiffs were successful on all fronts, they

would inevitably face lengthy appeals—and the history of antitrust litigation is riddled with successful verdicts overturned on appeal.[11] Indeed, even a verdict that is manifestly correct under existing law is not guaranteed success on appeal; the Supreme Court recently observed that it "has viewed stare decisis as having less-than-usual force in cases involving the Sherman Act." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2412 (2015); *see also, e.g.*, *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877 (2007) (reversing 100-year-old precedent and vacating jury verdict).

The Varnum Objectors criticize Plaintiffs for not specifically identifying potential weaknesses in the case. Varnum Br. at 25. But because there is always risk that a settlement will fall through, Class Counsel would jeopardize Plaintiffs' chances of success if they laid out a roadmap for how Plaintiffs' case might be defeated. Courts do not require such counterproductive showings before acknowledging the substantial risks to a litigated recovery in a complex antitrust case.

The objectors similarly criticize the District Court for, in their eyes, insufficiently scrutinizing the evidence. Varnum Br. at 25-26; Andrews Br. at 13,

---

[11] *See, e.g.*, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) (after ten years and two trials, the Supreme Court held for defendants and reversed the Second Circuit's remand for a third trial).

18-19. But this Court, like other circuits, "defer[s] to the district court's traditionally broad discretion over the evidence it considers when reviewing a proposed class action settlement." *UAW*, 497 F.3d at 636 (collecting cases). This Court has specifically rejected the argument that a "judge must strictly screen expert opinions" in a fairness hearing. *Id.* Quite to the contrary, "[i]n a fairness hearing, the judge does not resolve the parties' factual disputes but merely ensures that the disputes are real and that the settlement fairly and reasonably resolves the parties' differences." *Id.* at 636-37. The District Court made clear that its determinations were made "in light of Plaintiffs' expert's analysis as to damages," RE213, PgID6995, and there is no reason to believe that it did not have sufficient reasons to rely on that analysis, which had been the subject of extensive briefing for the class certification and *Daubert* motions.

> b.      *Complexity, Expense, and Duration*

According to the Varnum Objectors, "the bulk of the work necessary to get the case ready for trial has already been done" and the costs "are largely 'sunk costs' at this point." Varnum Br. at 27. If only it were so. With *Daubert* not fully briefed, class certification undecided, a Rule 23(f) appeal by BCBSM certain if the District Court certified a class, expert work on relevant market issues barely begun, summary judgment motions yet to be filed, trial preparation still in the future, and

trial and appeal hardly on the horizon, no one could claim in good faith that this case was all but over.

### c.    The Amount of Discovery

The Varnum Objectors concede that "Plaintiffs engaged in a very significant amount of discovery in this case." Varnum Br. at 28. That alone shows that this factor favors settlement.[12] But the Varnum Objectors claim it weighs *against* this settlement because the parties did not analyze that evidence in detail in their settlement approval papers and the District Court did not state "the extent to which discovery has (1) confirmed Plaintiffs' allegations, (2) enhanced or developed additional information in support of Plaintiffs' allegations, or (3) identified weaknesses in Plaintiffs' case that might motivate settlement." Varnum Br. at 28-29.

Unsurprisingly, the Varnum Objectors cite no authority for such a requirement. As noted above, the District Court has "traditionally broad discretion over the evidence it considers when reviewing a proposed class action settlement."

---

[12] *See, e.g.*, *Bronson v. Bd. of Educ.*, 604 F. Supp. 68, 73 (S.D. Ohio 1984) (citing *Williams v. Vukovich,* 720 F.2d 909, 922–23 (6th Cir. 1983)) ("[W]hen significant discovery has been completed, the Court should defer to the judgment of experienced trial counsel who has evaluated the strength of his case."); *cf. Sheick v. Auto. Component Carrier LLC*, No. 09-cv-14429, 2010 WL 4136958, at *19 n.3 (E.D. Mich. Oct. 18, 2010) (noting that "courts do not [even] require formal discovery so long as the parties have adequate information in order to evaluate the relative positions").

*UAW*, 497 F.3d at 636. The discovery factor exists to determine whether class counsel "entered into the settlement negotiations with much more than an uneducated guess as to the merits of the case and the propriety and fair value of a settlement." *Olden*, 294 F. App'x at 218. After 169 depositions, millions of pages of document discovery, and expert analysis of terabytes of data, Class Counsel had more than enough information to judge the value of the settlement.

### d.    *The Opinions of Class Counsel and the Named Plaintiffs*

The objectors claim that "[t]he District Court placed far too much weight on the opinion of class counsel that the settlement was reasonable." Varnum Br. at 30. But the District Court considered all of the *UAW* factors in approving the settlement, and there is no indication that this one factor played an outsized role. Furthermore, the Varnum Objectors' sole argument against giving substantial weight to the opinions of Plaintiffs and their counsel is their alleged preferential treatment under the settlement.  But, as noted above, the settlement agreement guaranteed no attorneys' fees, expenses, or service awards, committing them entirely to the discretion of the District Court.  The settlement confers no special treatment on Plaintiffs or Class Counsel.  The District Court simply followed this Court's directions to "'presume[] that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process

demands' absent 'evidence of improper incentives,'" RE213, PgID6989 (quoting *UAW*, 497 F.3d at 628), and to "defer to the judgment of experienced counsel who have evaluated the strength of the proofs," RE213, PgID6996 (citing *Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983)).

Relatedly, Mr. Andrews claims several class representatives should have been dismissed from the case, based on his reading of Plaintiffs' Motion to Add and Drop Named Plaintiffs. Andrews Br. at 21-24. Plaintiffs sought to change the named plaintiffs not because they "were never valid class members," Andrews Br. at 21, but because their purchases were outside the narrow category for which Dr. Leitzinger could quantify damages. RE124, PgID1629. Their continuing presence as class representatives should *strengthen* confidence in the settlement, not undermine it, as it ensured class representation for all three settlement categories. *See* RE169, PgID5331. Indeed, Mr. Andrews argued below that the settlement could not be approved *without* class representatives from all three categories— nearly the reverse of what he argues now. RE163-2, PgID4880-81. His argument here is new and thus waived. *Flowers*, 513 F.3d at 552.[13]

---

[13] Mr. Andrews also argues for the first time that expanding the class period was impermissible, but this Court has expressly affirmed approval of settlements that "redefin[ed] the class in connection with the settlement ... result[ing] in the addition of class members." *Lindsey v. Memphis-Shelby Cnty. Airport Auth.*, F.3d 1150, at *7 (6th Cir. 2000) (unpub. op.).

2047135.1

*e.* *Reaction of Absent Class Members*

As the District Court observed, the number of opt outs equaled just 0.05% of the three million potential class members receiving direct notice. RE213, PgID6997. Countless courts have found that opt-out levels far higher supported approval. *See id.* (collecting cases). Similarly, there were only four objections, representing 32 class members—less than one in every 100,000 class members. *Id.* By contrast, this Court has affirmed approval where "seven out of 109" objected—a rate more than 6000 times higher than here. *Laskey v. UAW*, 638 F.2d 954, 957 (6th Cir. 1981).

As with the other factors, the objectors try to deny the obvious implications of these facts. The Varnum Objectors point to the decision by two large insurers to file their own suits. But as discussed above, competing insurers could seek *lost profits* damages; their election to seek those damages in an individual lawsuit says nothing about whether the settlement's recovery of *overcharge* damages is fair, reasonable, and adequate under the circumstances of this class action.

The objectors also cite the claims rate, but courts routinely reject arguments to deny settlements based on the ratio of claims, particularly where—as here—the settlement contains no reversion clause and the claims rate does not affect the amount distributed. *See, e.g.*, *In re Packaged Ice Antitrust Litig.*, No. 08-MDL-

01952, 2011 WL 6209188, at *14 (E.D. Mich. Dec. 13, 2011) (collecting cases and affirming settlement where responses were "just under 1% of the total number of Notices mailed").[14] Moreover, the majority of purchases at issue are in Category 3. Claims in this category have little if any value, and only a very small portion of the recovery, therefore, was allocated to them. It is unsurprising that few class members would make claims for Category 3 purchases, given the size of their possible recovery. Similarly, the vast majority of class members are individuals with small claims too small to justify filing. In contrast, many of the largest purchasers of hospital services in Michigan filed claims and did not object. RE169, PgID5331. Simply put, the claims rate has much more to do with the realities of this class of millions of small claimants, many with highly attenuated claims, and nothing to do with the reasonableness of the settlement amount.

Mr. Andrews takes two other shots at the same point, citing a study by Plaintiffs' notice expert, Dr. Wheatman, and a comment thread on Facebook.

---

[14] *See also, e.g.*, *Lee v. Ocwen Loan Servicing, LLC*, No. 14-CV-60649, 2015 WL 5449813, at *22-23 (S.D. Fla. Sept. 14, 2015) (collecting cases); *Dick v. Sprint Commc'ns Co.*, 297 F.R.D. 283, 291 (W.D. Ky. 2014) (identifying "no cases that require a court to consider the claims rate before assessing whether a settlement is fair, reasonable, and adequate"); *Schulte v. Fifth Third Bank*, No. 09-cv-6655, 2010 WL 4483975, at *2 (N.D. Ill. Nov. 8, 2010) (rejecting argument because funds "will not revert to Defendant"); *cf. Boeing Co. v. Van Gemert*, 444 U.S. 472, 480-81 (1980) (in common fund case, attorneys' fees should be calculated against entire fund rather than claims made).

Andrews Br. at 27-29. Neither is properly before this Court: the first was never raised below, and the second raised well after the objection deadline. *See, e.g.*, *Allstate Ins. Co. v. Glob. Med. Billing, Inc.*, 520 F. App'x 409, 412 (6th Cir. 2013) (refusing to consider argument "that Plaintiff inexcusably waived by failing to raise it at the proper time before the district court").

In any event, neither comes close to suggesting abuse of discretion. Mr. Andrews compares the claims rate to the rate Dr. Wheatman observed in *insurance/finance* cases—but this case is no more an "insurance" case than an antitrust case involving shipping is an admiralty case. This case more closely resembles consumer actions, where Dr. Wheatman reported a claims rate from 0-10%. *See* Tiffaney Janowicz, Shannon Wheatman & Robert Ahdoot, *Settlement Administration: Impacting Claims Filing Rates* (Feb. 18, 2014), http://media.straffordpub.com/products/crafting-class-settlement-notice-programs-due-process-reach-claims-rates-and-more-2014-02-18/presentation.pdf. The Facebook comments, of course, illustrate only that people complain on Facebook. If class members had serious concerns about the settlement, they could have objected, as the notices explained; that so few did (and even fewer without apparent ulterior motives) speaks to the settlement's adequacy.

2047135.1

### f. The Public Interest

Here again, the objectors ignore the District Court's actual reasoning and the way courts apply *UAW*. The Varnum Objectors assert that the public interest should be "analyzed by assessing the reasonableness of the settlement to the class," Varnum Br. at 32, an approach that would read the public interest factor out of *UAW*. The District Court, by contrast, applied the factor as this Court has directed, looking at the "strong public interest in encouraging settlement of complex litigation," the "time to resolve this matter," and the strain it would place on "judicial resources." RE213, PgID6999 (quoting, *inter alia*, *Granada*, 962 F.2d at 1205). Indeed, as the District Court noted, this case has an unusual circumstance further putting settlement in the public interest: trial would require appearances by many of the 169 deponents—which included employees of over 100 third parties, including dozens of hospitals. RE213, PgID6999; *see also* RE169, PgID5333. This could place a not insignificant burden on Michigan's healthcare system, strengthening the public interest in settlement.

### g. Risk of Fraud and Collusion

The objectors rest heavily on the supposed risk of fraud and collusion. But courts must "presum[e] that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands"

absent "evidence of improper incentives." *UAW*, 497 F.3d at 628. As demonstrated throughout this brief, the papers below, and the District Court's opinion, the objectors' speculation and calumny is factually bankrupt and conceptually nonsensical. Quite to the contrary, the structure of the settlement aligned Class Counsel's interests directly with the class members' interests. Because the settlement guaranteed Class Counsel nothing and required them to petition the District Court, Class Counsel had every incentive to negotiate as large a settlement as possible.[15] The District Court rightly relied on its observations of the litigants and review of the evidence to reject this argument. RE213, PgID6985-6990.

It also bears noting that Class Counsel have a long history of aggressively litigating cases, including through trial and to the Supreme Court. For example, Co-Lead Counsel Cohen Milstein recently won a billion-dollar judgment against Dow Chemical Company after a lengthy antitrust trial. *See In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1252-53 (10th Cir. 2014). Class Counsel's track record

---

[15] *See, e.g.*, *Hayes v. Harmony Gold Mining Co.*, 509 Fed. App'x 21, 24 (2d Cir. 2013) ("[T]he prospect of a percentage fee award from a common settlement fund ... aligns the interests of class counsel with those of the class."); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 88 (D.D.C. 2013) ("This percentage-of-the-fund approach 'helps to align more closely the interests of the attorneys with the interests of the parties ... .'") (quoting *Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*, 3 F.3d 1568, 1573 (D.C. Cir. 1993)).

2047135.1

suggests not that they sell out for easy paydays, but rather that they carefully assess their cases' value and seek the best resolution for the classes they represent.

### h.    Preferential Treatment

Finally, the Varnum Objectors and Mr. Mancinelli claim the settlement provided "preferential treatment to the named plaintiffs [but] only perfunctory relief to unnamed class members." *Vassalle*, 708 F.3d at 755 (quoting *Williams*, 720 F.2d at 925 n.11). As the District Court found, the recovery of "25 percent of the $118 million in estimated damages" cannot be called "illusory or perfunctory." RE213, PgID7000-01. Nor is the District Court's careful evaluation of the named plaintiffs' contributions and its decision to award them service awards within a range approved in other cases unreasonable, as discussed *infra* pp. 53-54.

More generally, the "preferential treatment" cases have nothing in common with this case. They deal with situations where absent class members' injuries were addressed with illusory relief while named plaintiffs' injuries were compensated in a wholly different manner. In *In re Dry Max Pampers Litigation*, 724 F.3d 713 (6th Cir. 2013), unnamed class members received "nearly worthless injunctive relief," while named plaintiffs received "$1000 per 'affected child'" and class counsel received $2.73 million—"in a case where counsel did not take a single deposition, serve a single request for written discovery, or even file a response to [defendant's]

motion to dismiss." *Dry Max*, 724 F.3d at 715, 718. Nothing could be further from the case here: class members were entitled to a share of a significant recovery, class representatives received awards reflecting their contributions to the case rather than their injuries, and class counsel received less than their lodestar after years of hard-fought litigation.

Similarly, in *Vassalle*, the defendants had filed individual debt collection actions against each class member. 708 F.3d at 751-52. The class action alleged that defendants' employees had "robo-signed" affidavits falsely claiming personal knowledge of the class members' debts. *Id.* The settlement forbade absent class members from using the affidavits to oppose the debts. *Id.* at 754-55. As this Court observed, this "virtually assure[d] that [defendant] will be able to collect on these debts." *Id.* at 755. By contrast, named plaintiffs were fully exonerated from their debts. *Id.* This case bears no resemblance at all to *Vassalle*.

The Varnum Objectors and Mr. Mancinelli point out that most class members would receive small amounts if all class members were to claim. Varnum Br. at 41; Mancinelli Br. at 23. Most class members would receive small amounts because most class members had a low probability of establishing any damages, let alone significant damages. This accurately reflects the strength and value of their claims—unlike *Dry Max*, where absent class members received "nearly worthless

injunctive relief," 724 F.3d at 715, or *Vassalle*, where the settlement made absent class members' debts unimpeachable and thus affirmatively harmed them, 708 F.3d at 755. The District Court did not abuse its discretion in finding that the monetary relief available here, totaling approximately $30 million with no reversion to BCBSM, was not "perfunctory."

## B. The District Court Correctly Found the Plan of Allocation and Cy Pres Provision Fair, Reasonable, and Adequate

None of the objectors dispute that the District Court acted within its discretion in finding the plan of allocation fair, reasonable, and adequate. As the District Court explained, the plan of allocation was structured so that "the stronger claims receive more than the other claims where damages are less." RE213, PgID7002. This is exactly as it should be. "[W]hen real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 589 (N.D. Ill. 2011) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997)).[16] No objector argues that

---

[16] *See also, e.g.*, *UAW*, 497 F.3d at 629 ("Neither the Federal Rules of Civil Procedure nor the Supreme Court requires that settlements offer a pro rata distribution to class members ... ."); *In re Heritage Bond Litig.*, No. 02-ml-1475, 2005 WL 1594403, at *11 (C.D. Cal. June 10, 2005) ("A plan of allocation that

this is inappropriate, let alone that the District Court abused its discretion in approving it.

Mr. Andrews and Mr. Mancinelli do criticize the settlement's *cy pres* provision. Mr. Andrews claims the plan of allocation did not define the amount below which distributions would be deemed "too small" to economically distribute. Andrews Br. at 29-30. This is incorrect. The plan of allocation (which Mr. Andrews cites two sentences earlier) explicitly sets the threshold at $10, and imposes additional conditions limiting the situations in which funds may go to *cy pres*. RE148-1, PgID4290.[17] This was also explained in Plaintiffs' motion for final approval. RE169, PgID5338. The actual provision is comfortably within the range that courts approve as infeasible to distribute. *See, e.g.*, *In re Mut. Funds Inv. Litig.*, No. 04-md-15863, 2011 WL 1102999, at *3 (D. Md. Mar. 23, 2011) (collecting cases with minimums as high as $50).

---

reimburses class members based on the extent of their injuries is generally reasonable. It is also reasonable to allocate more of the settlement to class members with stronger claims on the merits.") (quoting *In re Oracle Sec. Litig.*, No. 90-cv-0931, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994)).

[17] Specifically, the only claims that could possibly go to *cy pres* are Category 3 claims below $10 filed by claimants with no Category 1 or Category 2 purchases, and even then only if there are 100 or more such claims. RE148-1, PgID4290.

Mr. Mancinelli's argument is similarly misplaced. He misunderstands the *cy pres* provision to be related to the 3.5% cap in Category 1, Mancinelli Br. at 22, when it applies only to administratively infeasible amounts in Category 3.

Mr. Andrews and Mr. Mancinelli also point out that BCBSM has donated to the Free Clinics of Michigan outside this litigation. Andrews Br. at 29-30; Mancinelli Br. at 10. They never pointed this out below and thus waived this argument. *Flowers*, 513 F.3d at 552. Even if it were not waived, it is inconsequential. One would be hard-pressed to find a healthcare charity in Michigan *without* some connection to BCBSM, the largest insurer in the state.[18] That unsurprising fact hardly suggests some unexplained "quid pro quo." Andrews Br. at 29-30.

They do not dispute that the selection of the Free Clinics "account[s] for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011).[19] No argument was

---

[18]  Because Mr. Andrews did not raise this claim below, Plaintiffs had no opportunity to explain that the Free Clinics is one of the few healthcare charities in Michigan whose Board of Directors is unaffiliated with BCBSM. *See* Free Clinics of Michigan, *Board of Directors*, www.fcomi.org/board-of-directors.html.

[19]  *Accord, e.g.*, *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 33-36 (1st Cir. 2009); 4 Herbert B. Newberg et al., Newberg on Class Actions § 11:20 (4th ed. 2012).

2047135.1

made below that this was an inappropriate *cy pres* recipient, and no serious argument against it has been made here.

Mr. Andrews also notes that "[t]he amount in cy pres is not in the record." Andrews Br. at 30. It is not in the record because the claims period did not close until after the Fairness Hearing, and thus the amount going to cy pres could not have been determined in time to enter it into the record.[20]

## C. The District Court Did Not Abuse Its Discretion in Determining the Notice Was the Best Practicable Notice

In its order preliminarily approving the settlement, the District Court found that the notice plan and the content of the notices constituted the best practicable notice. RE151, PgID4422. Given that the notice plan entailed direct notice to roughly three million potential class members, state-wide publication notice, three different forms of notice designed by a well-regarded notice expert, a settlement website containing the settlement papers and full-length notice, and a toll-free call center, this is well within the District Court's "'virtually complete discretion' in selecting the kind of notice to employ in order to inform class members of a

---

[20] It bears repeating that *cy pres* applies only to a subset of Category 3 claims. *Cy pres* can thus total at most two percent of the settlement fund, and likely will total significantly less; indeed, if fewer than 100 people file Category 3 claims below $10 without accompanying Category 1 or 2 claims, *no* money will go to *cy pres*.

settlement hearing." *Franks*, 649 F.2d at 122-23 (quoting Wright & Miller, *Fed. Practice & Proc.: Civil*, § 1979).

Mr. Andrews makes three arguments against the notice. First, he argues that notice should have been emailed to class members. Andrews Br. at 24. This argument was not made below and is waived. *Flowers*, 513 F.3d at 552.[21] In any event, Plaintiffs are unaware of any court ever finding email the only reasonable notice. Moreover, while email notice is often appropriate in cases dealing with internet purchases, this case deals with medical services purchased as early as 2006. Undoubtedly, countless class members were not using email to conduct healthcare business during the class period or have changed their email address since their relevant purchases. Mr. Andrews' proposal would leave these class members in the dark.

Second, Mr. Andrews notes that the list of relevant hospitals for the claim form omitted certain hospitals. Andrews Br. at 25-27. But the version he criticizes included an "other" option letting class members fill in any hospital, and was on the website for just one weekend. RE169-4, PgID5419. Regardless, Mr. Andrews's own authorities show that claims processes can be altered as circumstances require.

---

[21] Indeed, before the District Court, Mr. Andrews argued not that email was needed but that notice should have been "written on paper and placed in an envelope or an eight page detailed notice on 8.5 by 11 sheet of paper folded over and secured at both ends and placed in the recipient's mailbox." RE163-1, PgID4868.

*See Union Asset Mgmt.*, 669 F.3d at 641 (no abuse of discretion where court expanded eligibility for recovery without reopening claims period).

Third, Mr. Andrews asserts that the release of claims "on pages 58-59" was "missing" from the online copy of the settlement agreement, so class members "were tricked into agreeing to it." Andrews Br. at 31. Mr. Andrews is confusing *paragraph* numbers with *page* numbers. The release is exactly where class members were told it was, at *paragraphs* 58-59. *See* RE148-1, PgID4235-36.

Mr. Mancinelli also argues that the notice process was inadequate, based on seeing the notice sent to his daughter but not one addressed to him. Mancinelli Br. at 18. Even assuming this to be correct, one anecdote hardly contradicts the sworn testimony that Epiq sent notice to millions of class members, and that millions more received publication notice.

## D.     The District Court Did Not Abuse Its Discretion in Approving the Claims Process

Finally, the Varnum Objectors claim that the claims process is "unreasonably burdensome" because it required organizational claimants to provide some form of verification of their claims. Varnum Br. at 37-41. As an initial matter, the Varnum Objectors misstate the requirement. Self-insurers and third-party payors never had to submit "copies of hospital bills." Varnum Br. at 37. As the claims form itself stated, organizational claimants could provide "hospital

bill(s) *or other record(s)*" that showed what they bought, from whom, and when. RE148-1, PgID4276 (emphasis added). Any record showing the purchases sufficed, such as a simple spreadsheet output from a company's claims database. Had Varnum or a single one of the Varnum Objectors contacted the help line, the claims administrator, or Class Counsel, they would have received confirmation of what the claims form stated. They never did.

The Varnum Objectors claim more generally that organizational class members "should have been able to submit a claim that aggregated their total payments to Michigan hospitals since 2006" and that "supporting documentation should not have been required." Varnum Br. at 38. Here as always, they provide no authority or other reason to believe documentation requirements are outside the discretion of a district court. More generally, their approach is unworkable. The plan of allocation (which the Varnum Objectors do not challenge) could not work without knowing where and when a purchase occurred. Simply sending "aggregated ... total payments" would have made it impossible to tailor relief to the relative strengths of class members' claims. Moreover, self-insurers and third-party payors necessarily had to look at their records to determine how much they paid; asking them to provide an excerpt of those records is a small incremental burden.

2047135.1

Given the size of many organizational claims, ensuring their accuracy was important to ensuring fair and appropriate distribution.

Mr. Mancinelli similarly argues that the claims process was unnecessarily burdensome for individuals, arguing that "Blue Cross has access to the information necessary to calculate the claims of class members whose health care is managed by Blue Cross." Mancinelli Br. at 12. This is incorrect; the crucial question is how much the *class members* paid to hospitals, not how much Blue Cross paid to hospitals *on behalf of class members*. Moreover, as explained above, individuals were not required to submit "medical records, invoices, or EOBs," as Mr. Mancinelli mistakenly believes. *Id.* A good-faith estimate sufficed, absent any indication that the estimate is fraudulent.

Accordingly, as with all other components of the settlement, the District Court did not err in finding the claims process to be fair, reasonable, and adequate.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN AWARDING ATTORNEYS' FEES, EXPENSES, OR SERVICE AWARDS

### A. Attorneys' Fees and Expenses

None of the objectors even attempt to show that the District Court abused its discretion in evaluating attorneys' fees under this Court's six-factor test. *See Moulton*, 581 F.3d at 352; RE213, PgID6984-98. The objectors' silence confirms

that its determination of an appropriate award of fees and expenses well within its "wide discretion." *Barnes*, 401 F.3d at 746.

To the extent the objectors address the awards, their criticisms are meritless. The Varnum Objectors' discussion is barely a page, pointing out only that the combined award of fees and expenses amounts to $13.5 million of the $29,990,000 common fund. Varnum Br. at 41-42. Courts routinely reject such arguments.[22] The massive investments of time and expense required by most antitrust cases (not least, the development of sophisticated econometric models) do not go away just because a case is worth tens of millions of dollars rather than billions of dollars. In all cases, this Court requires fair compensation, *Rawlings*, 9 F.3d at 516, and gives the district court wide discretion in determining that amount. The District Court was well within its discretion to conclude that Class Counsel deserved the awarded amount for litigating a novel and highly complex rule of reason case against a "formidable opponent" and obtaining an all-cash recovery of tens of millions of dollars. RE213, PgID7008. Indeed, given that courts routinely award fees that

---

[22] *See, e.g.*, *Ko v. Natura Pet Prods., Inc.*, No. 09-cv-2619, 2012 WL 3945541, at *6-7 (N.D. Cal. Sept. 10, 2012) (rejecting objection that fees plus costs, incentive awards, and administrative expenses "reduce the common fund by more than half"); *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 937 (N.D. Ohio 2003) (quoting *Manners v. Am. Gen. Life Ins. Co.*, No. 98-cv-0266, 1999 WL 33581944, at *29 (M.D. Tenn. Aug. 11, 1999) (collecting cases) ("[T]hroughout the Sixth Circuit, attorneys' fees in class actions have ranged from 20%–50%.").

2047135.1

represent a multiplier of Class Counsel's lodestar,[23] it can hardly be argued that an award of *less than two-thirds* of Class Counsel's lodestar is an abuse of discretion.

Mr. Andrews similarly declines to address the District Court's actual analysis of the facts before it. Instead, he makes heated and baseless allegations of wholesale fraud, claiming that the expert's expenses "may" be "intentionally bloated and fraudulent" and that Class Counsel inflated their hours, engaged in something called a "'ghost promotion' scheme,"[24] performed "excessive, duplicative, unnecessary, unproductive, inefficient, redundant, and wrong" work, and otherwise committed "bad faith misconduct fee inflation and a fee fraud scheme." Andrews Br. at 32-35. These scandalous allegations are entirely meritless. Although the details in his appellate brief are sparse,[25] before the District

---

[23] *See, e.g.*, *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 767–68 (S.D. Ohio 2007) (awarding a multiplier of six and noting that "[m]ost courts agree that the typical lodestar multiplier ... ranges from 1.3 to 4.5").

[24] Mr. Andrews appears to be referring to the practice of calculating attorneys' fees at each attorney's current, rather than historical, rates. But this Court and the Supreme Court have expressly approved use of current rates as "an adjustment for delay in payment." *Barnes*, 401 F.3d at 745 (citing *Missouri v. Jenkins*, 491 U.S. 274 (1989)).

[25] This Court generally does not consider arguments supported only by citations to district court briefs. *See, e.g.*, *Capitol Park Ltd. Dividend Hous. Ass'n v. Jackson*, 202 F. App'x 873, 879-80 & n.2 (6th Cir. 2006); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Accordingly, Plaintiffs are responding only to arguments Mr. Andrews makes in this brief, not to all of the groundless and often unintelligible allegations Mr. Andrews made in his various untimely filings. If the

Court Mr. Andrews spent hundreds of pages copying and pasting pages from Class Counsel's websites, proving only that he neither understood nor accurately reported what he found. The one example Mr. Andrews provides in his appellate brief—claiming that Class Counsel fraudulently billed a technology manager as "Of Counsel," Andrews Br. at 34—is a case in point. Mr. Andrews's allegation is demonstrably false: the technology manager in question was reported as "Other," not "Of Counsel." RE209, PgID6936.

None of these allegations were raised until after the objection deadline; indeed, many of them were not made until months after the fairness hearing. The technology manager allegation, for example, was made on January 22, 2015, more than two months after the fairness hearing and nearly four months after the objection deadline. RE209.[26] Thus the Court need not consider these charges. *See Flowers*, 513 F.3d at 552.

Mr. Andrews also demands to see the actual receipts supporting Class Counsel's stated expenses. But a district court has wide discretion in determining

---

Court desires a response to any of those charges, Plaintiffs will be happy to provide one.

[26] Had Mr. Andrews timely raised it, Plaintiffs might have had occasion to explain the important role "a ten year, full time technology manager employee," Andrews Br. at 34, plays in a years-long case involving millions of pages of documents, several terabytes of data, and 169 depositions. Mr. Andrews's disregard for court schedules denied Plaintiffs that opportunity.

what specific backup to require for expense requests. *See, e.g., Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, No. 98-cv-479, 2008 WL 906031, at *1 (W.D. Mich. Mar. 31, 2008) ("The court has substantial discretion in determining whether to conduct an evidentiary hearing on a fee petition ... [or] to resolve material factual disputes based on the affidavits and written documentation submitted.") (citing *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1402 (6th Cir. 1995)). Because the requested amount was supported by sworn declarations of counsel and was "reasonable, in light of the time, resources, expert analysis and complexity of this class action case"—and particularly in light of the "complicated analysis by experts as to how the MFN clauses impacted healthcare services in Michigan using [an] extraordinarily large amount of data" required by the case—the District Court was entirely within its discretion in awarding the amount without reviewing invoices. RE213, PgID7010.[27]

---

[27] Mr. Andrews newly claims that Plaintiffs' fee motion was not posted on the settlement website until "after the objection window closed if memory serves." Andrews Br. at 33-34. This is incorrect; the fee motion and proposed order were on the website from the day they were filed.

**B.     The District Court Did Not Abuse Its Discretion in Awarding Service Awards**

The objectors criticize the service awards that the District Court granted to the class representatives, but do so only in generic terms that once again do not engage with the District Court's analysis or the facts of the case. None of the objectors consider the facts that the District Court evaluated: the "thousands of documents" produced, the "knowledge of the industry" the organizational plaintiffs shared with Class Counsel, the "assist[ance] in drafting and responding to discovery requests," the deposition testimony, and the other "important and indispensable service[s]" they provided to the class. RE213, PgID7012. Simply put, without the work of the class representatives, there would be no case.

Instead of confronting the District Court's recognition of the class representatives' efforts, the Varnum Objectors suggest that any awards significantly exceeding class members' recoveries are "unfair to the class and create[] a conflict of interest." Varnum Br. at 42. This wildly overreads Varnum's authorities, *Dry Max* and *Vassalle*; as discussed *supra* pp. 39-41, those cases both involved "relief" that was at best worthless and at worst made absent class members worse off, while named plaintiffs received a different form of relief that

was not tied to their contributions to the case.[28] The Varnum Objectors effectively argue that service awards can *never* be significantly larger than the average class recovery—a novel rule that would undermine the positive incentives created by reasonable service awards. *See Hadix*, 322 F.3d at 897. If a district court could not award meaningful compensation for the time, burden, and risk involved in representing a class, very few would subject themselves to the demands of litigation and the relentless scrutiny of zealous defense counsel. The resulting free-rider problem would often leave the goals of Rule 23 unrealized.

Of course, there is no such rule, for this very reason. The District Court had discretion to consider the appropriate amounts to compensate the various class representatives for their efforts, and chose amounts within or even at the low end of the range often awarded. *See Hadix*, 322 F.3d at 898 (collecting cases awarding between $35,000 and $55,000); *see also, e.g.*, *Sewell v. Bovis Lend Lease, Inc.*, No. 09-cv-6548, 2012 WL 1320124, at *14 (S.D.N.Y. Apr. 16, 2012) (collecting cases awarding between $15,000 and $425,000). There is no abuse of discretion here.

---

[28] Moreover, *Vassalle* expressly *declined* to "pass on the appropriateness of incentive awards," 708 F.3d at 756; it did not hold that the awards alone would have justified rejecting the settlement, as the Varnum Objectors imply.

2047135.1

## III. THE OBJECTORS ARE NOT REPRESENTATIVE OF CLASS MEMBERS

It bears reiterating that the Varnum Objectors and Mr. Andrews each have significant interests unrelated to the merits of the settlement that suggest their objections serve their own agendas. Especially given the lack of merit to their substantive objections, their claims to represent the interests of class members should be viewed with deep skepticism.[29]

### A. The Varnum Objectors Are Embroiled in Litigation with BCBSM

As noted above, every one of the Varnum Objectors is a plaintiff in unrelated litigation against BCBSM, all represented by their counsel here, Varnum LLP. Varnum has filed more than 50 suits against BCBSM. RE169, PgID5383. The fact that the Varnum Objectors consist solely of companies embroiled in litigation against BCBSM suggests they seek advantage in their other litigation. The substance of their objections strengthens this impression: in the District Court and again here, they have focused much of their efforts on an attempt to gain access to sealed documents in this case, perhaps hoping to find something of use in their own litigation. At a minimum, the fact that the only organizational class

---

[29] Plaintiffs have no reason to doubt Mr. Mancinelli's motives and do not intend these criticisms to reflect on him. Given that Mr. Mancinelli filed the only unconflicted objection, however, the tens of thousands of claimants and millions of non-objectors appear to better reflect the sentiments of the class.

members objecting were long-time adversaries of BCBSM, while many insurers, employers, and union funds filed claims (including some of the largest in Michigan), suggests that the Varnum Objectors are not representative of absent class members. RE169, PgID5331.

## B. Mr. Andrews Is a Professional Objector Who Tried to Extort $150,000 from Class Counsel

While the Varnum Objectors' circumstances merely suggest mixed motives, Mr. Andrews's intentions are indisputable. From his first communications with Class Counsel, he explained that his objection was "all business." RE169-15, PgID5741. He has attempted to extort class counsel in numerous cases, sometimes getting paid and sometimes getting excoriated by courts. *See supra* p. 13. His objection here has nothing to do with the class's interest and everything to do with his own financial interest.

Mr. Andrews's scheme is an unfortunately common one. *See, e.g.*, *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 295 n.26 (E.D. Pa. 2003) (collecting cases and noting "[f]ederal courts are increasingly weary of professional objectors"). But even by the standards of professional objectors, Mr. Andrews's tactics are beyond the pale. Mr. Andrews' threats and demands during the district court proceedings not only were "not warranted by the law and facts of the case, were not filed in good faith and were filed to harass Class Counsel," RE213,

68

PgID7014, they were nakedly extortionate, demanding that Class Counsel pay Mr. Andrews *whether or not* the District Court ruled in his favor, RE206-1, PgID6638 ("[H]ave a check ready for me to pick up or be delivered by Tuesday 5:00 pm regardless of how the Court rules. If not it will get much worse when I take further action starting on Wednesday."); *cf. United States v. Jackson*, 180 F.3d 55, 70-71 (2d Cir. 1999) (finding threat with "no nexus to a claim of right" to be extortion).

Mr. Andrews's *pro se* status prevents courts from disciplining him as they would an attorney engaged in such conduct. But it need not prevent the Court from requiring compliance with judicial deadlines. All of Mr. Andrews's substantive arguments below came in untimely filings for which he did not seek leave. Untimely objections need not be considered. *See, e.g.*, *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 246 (D.N.J. 2005) (collecting cases). Even a *pro se* litigant must "adhere to readily comprehended court deadlines of which he was well-aware." *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991).[30] Mr. Andrews was plainly aware of the objection deadline; indeed, he filed a placeholder objection on that day. RE159. That is the only objection this Court should

---

[30] *See generally Wong v. Accretive Health, Inc.*, 773 F.3d 859, 861 n.1 (7th Cir. 2014) (denying "customary solicitude offered to pro se litigants" to a *pro se* serial objector because "[d]espite [his] *pro se* status, he is an experienced litigator"); *Hayes v. Harmony Gold Mining Co.*, 509 F. App'x 21, 23 n.1 (2d Cir. 2013) (declining to consider waived argument by "frequent class action objector and appellant," despite *pro se* status).

consider; all others should be treated as untimely, and arguments first raised in those filings need not be considered. *Flowers*, 513 F.3d at 552. This would dispose of Mr. Andrews's entire objection, as his timely objection was simply a laundry list of conclusory assertions.

For similar reasons, the many cursory allegations that Mr. Andrews throws into his kitchen-sink appellate brief without elaboration need not be considered. "[I]t is a 'settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).

Nonetheless, Plaintiffs have responded to most of Mr. Andrews's arguments, despite the cryptic nature of many of his claims. If the Court needs further responses to any of Mr. Andrews's points, Plaintiffs can address them at oral argument (if the Court orders argument) or in additional briefing.[31]

---

[31] In particular, Plaintiffs deny Mr. Andrews's allegation that they violated attorney-client privilege by disclosing communications he made to their counsel. Plaintiffs responded to this ethical charge below. RE208, PgID6672-76. Mr. Andrews now claims that counsel "disclosed the real amount they would be happy with in exchange for the appellant to 'endorse the settlement.'" Andrews Br. at 37. This is false.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE MOTION TO INTERVENE

Finally, the Varnum Objectors appeal the denial of their motion to intervene to access various sealed documents. Varnum Br. at 33-36. The District Court denied the motion because it was untimely, RE213, PgID6975—a ruling the Varnum Objectors do not even acknowledge, let alone dispute. This Court can therefore affirm on that ground.

Even if the Varnum Objectors had challenged the timeliness ruling, it is plainly correct. The Varnum Objectors not only waited to intervene until years after the protective orders governing the discovery were entered and long after the individual documents themselves were sealed, they waited until the very end of the settlement approval process. Had they moved promptly upon receiving notice of the settlement, perhaps their motion could have been timely—but instead they made the strategic decision to object, and only *then* seek the documents. This belies their claim that they needed the documents "in order to determine whether to participate in the settlement, object, or opt out." Varnum Br. at 12. They determined to object and oppose the settlement long before they moved to intervene, waiting until four months after preliminary approval, one month after the objection deadline, and just three weeks before the fairness hearing. There can thus be no dispute that the District Court acted within its discretion in finding the

motion untimely. *See, e.g.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001) (motion to intervene three months after notice began untimely); *Farinella v. Paypal, Inc.*, 611 F. Supp. 2d 250, 258 (E.D.N.Y. 2009) (same; two and a half months).

Timeliness aside, the Varnum Objectors' motion was meritless. Objectors have no right to examine sensitive, sealed information on the mere hunch that they contain something adverse to the settlement. The crucial question is not whether the *objectors* feel they have enough information to assess the settlement, but whether *the District Court* believes it has enough information. *See In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1084 n.6 (6th Cir. 1984) (correct question is "[w]hether or not the District Court had before it sufficient facts intelligently to approve the settlement offer") (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). Objectors have no right to arrogate to themselves the role of special master, parsing evidence the Court is more than capable of assessing itself. Quite to the contrary, a district court "'may limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasoned decision' and need not endow objecting class members with 'the entire panoply of protections afforded by a full-blown trial on the merits.'" *UAW*, 497 F.3d at 635 (quoting *Tenn. Ass'n of Health Maint. Orgs. v. Grier*, 262 F.3d 559,

567 (6th Cir. 2001)).[32] The Varnum Objectors' insistence that the documents were required to turn the fairness hearing into "an adversary-like process" is thus incorrect. Varnum Br. at 36.

The Varnum Objectors' authorities are entirely inapposite. *See* Varnum Br. at 33-35. Most simply recite the standards for sealing documents, shedding no light on whether the District Court's protective orders satisfy those standards. Some affirmatively acknowledge that there is "no authority" that a settlement cannot be approved "when the record includes documents filed under seal pursuant to a protective order." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 931 (8th Cir. 2005); *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 706 (E.D. Mo. 2002) (same). One explicitly notes that district courts "may limit the discovery or presentation of evidence to that which may assist [the court] in determining the fairness and adequacy" and that "objectors are not entitled to discovery concerning settlement negotiations between the parties in the absence of evidence indicating that there was collusion between plaintiffs and defendants." *In re Domestic Air Transp. Antitrust Litig.*, 144 F.R.D. 421, 424 (N.D. Ga. 1992)

---

[32] *See also Geier v. Alexander*, 801 F.2d 799 (6th Cir. 1986) (*Grinnell*, 495 F.2d at 464 (once parties have "support[ed] their conclusion to the satisfaction of the District Court ... they are not under any recurring obligation to take up their burden again and again *ad infinitum* unless the objectors have made a clear and specific showing that vital material was ignored by the District Court").

(quoting *in part* 2 Herbert B. Newberg, *Newberg on Class Actions* § 11.56 (2d ed. 1985)). And the only ones requiring discovery involved discovery into *the terms of the settlement*, not the underlying litigation.[33]

Finally, it bears repeating that the sealed documents include sensitive information produced by over 100 third parties, including the personal and medical information of millions of class members. The District Court carefully managed discovery to ensure that privacy rights—not least those protected by HIPAA— were respected. The immediate reaction of 29 Hospital and Insurer Intervenors to oppose the Varnum Objectors' request shows just how real that concern was. There can be no serious claim that the District Court lacked discretion to protect the privacy of this information and rely on its own review of the evidence.[34]

## V. CONCLUSION

For the foregoing reasons and those stated in the District Court's opinion, the judgment below should be affirmed.

Dated: Wednesday, September 23, 2015

---

[33] *See Baker v. Dolgencorp, Inc.*, 818 F. Supp. 2d 940 (E.D. Va. 2011) (refusing to seal settlement agreement); *Domestic Air*, 144 F.R.D. at 425 (allowing discovery into the conditions that would apply to the coupon relief plaintiffs would receive).

[34] If the Court wishes to review any sealed documents *in camera*, Plaintiffs can provide them pursuant to the procedures in Sixth Circuit Rule 25(h). However, Plaintiffs request relief from providing other parties a copy of sealed documents until this Court has determined whether objectors have any right of access.

2047135.1

Respectfully submitted:

THE MILLER LAW FIRM, P.C.

By: /s/ E. Powell Miller
E. Powell Miller
950 West University Drive, Suite 300
Rochester, Michigan 48307
Tel: (248) 841-2200

Daniel A. Small
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Avenue NW
Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

Daniel E. Gustafson
Daniel C. Hedlund
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844

Fred T. Isquith
Theodore B. Bell
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC
270 Madison Avenue
New York, New York, 10016
Tel: (212) 545-4690

David H. Fink (P28235)
Darryl Bressack (P67820)
FINK + ASSOCIATES LAW
100 West Long Lake Rd, Suite 111
Bloomfield Hills, MI 48304
Tel: (248) 971-2500

*Counsel for Plaintiffs-Appellees*

Nos. 15-1544, 15-1551, 15-1552

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————————————————————

THE SHANE GROUP, ET AL.,

*Plaintiffs-Appellees,*

v.

BLUE CROSS BLUE SHIELD OF MICHIGAN,

*Defendant-Appellee,*

CHRISTOPHER ANDREWS,

*Objector-Appellant*

SCOTT MANCINELLI,

*Objector-Appellant,*

ADAC AUTOMOTIVE, ET AL.,

*Objectors-Appellants.*

———————————————————————————

On Appeal from the United States District Court
for the Eastern District of Michigan, Southern Division,
No. 02:10-cv-14360-DPH-MKM

———————————————————————————

## CERTIFICATE OF COMPLIANCE

I, E. Powell Miller, do hereby certify pursuant to Fed. R. App. P. 32(a)(7)(C)(i) that the Brief of Plaintiffs-Appellees complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and 6th Cir. R. 32(b) because this brief contains 14,121 words and 1,281 lines excluding the parts of this brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). In addition, this Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007, Times New Roman font in 14 point size, with footnotes in Times New Roman font 14 point size.

Date: September 23, 2015

THE MILLER LAW FIRM, P.C.

By: /s/ E. Powell Miller
E. Powell Miller
950 West University Drive, Suite 300
Rochester, Michigan 48307
Tel: (248) 841-2200

2047135.1

Nos. 15-1544, 15-1551, 15-1552

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

THE SHANE GROUP, ET AL.,

*Plaintiffs-Appellees,*

v.

BLUE CROSS BLUE SHIELD OF MICHIGAN,

*Defendant-Appellee,*

CHRISTOPHER ANDREWS,

*Objector-Appellant*

SCOTT MANCINELLI,

*Objector-Appellant,*

ADAC AUTOMOTIVE, ET AL.,

*Objectors-Appellants.*
_____

On Appeal from the United States District Court
for the Eastern District of Michigan, Southern Division,
No. 02:10-cv-14360-DPH-MKM
_____

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2015, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

I also certify that I served a copy of the foregoing documents via first class US Mail and electronic mail upon:

Christopher Andrews
P.O. Box 530394
Livonia, MI 48152

Respectfully submitted:

THE MILLER LAW FIRM, P.C.

By: /s/ E. Powell Miller
E. Powell Miller
950 West University Drive, Suite 300
Rochester, Michigan 48307
Tel: (248) 841-2200

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Appellees state that all relevant documents to this appeal are part of the electronic record in the Eastern District of Michigan, Southern Division. To facilitate the Court's reference to the electronic record, said documents, as referred to herein above, are as follows:

| RECORD ENTRY # | DESCRIPTION OF DOCUMENT | PAGE ID# |
|---|---|---|
| 1 | Class Action Complaint | 1-42 |
| 138 | Scheduling Order No. 5 | 3074-3076 |
| 145 | Stipulated Order to Modify Briefing Schedule for Class Certification Motion, Daubert Motion, and to Extend the Deadline for Merits Expert Reports | 4179-4182 |
| 148 | Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement, Certification of Settlement Class, and Related Relief | 4187-4220 |
| 148-1 | Class Action Settlement Agreement | 4221-4321 |
| 148-2 | Declaration of Shannon R. Wheatman, Ph.D. on Adequacy of Notice Plan | 4322-4352 |
| 151 | Order Granting Preliminary Approval to Proposed Class Settlement | 4417-4425 |
| 159 | Objection to Proposed Class Action Settlement, filed by Christopher Andrews | 4626-4633 |
| 160 | Pro Se Objection of Scott Mancinelli to the Proposed Settlement | 4634-4641 |
| 161 | Joint Objection to Proposed Settlement, filed by Varnum LLP | 4648-4704 |
| 161-3 | Supplemental Disclosures of Aetna Inc. | 4709-4713 |

| 163 | Supplement to Existing Objection of Settlement Against Approval, Plaintiffs' Counsels Application for Attorneys' Fees, Rates, Hours, Expenses, Incentive Awards, Expenses of the Administrator, Notice, Notice Plan, and Release, filed by Christopher Andrews | 4772-4821 |
|---|---|---|
| 163-1 | Document Continuation of Record Entry 163 | 4822-4871 |
| 163-2 | Document Continuation of Record Entry 163 | 4872-4921 |
| 166 | Motion to Intervene for the Limited Purpose of Unsealing Records and Adjourning Fairness Hearing, filed by Varnum LLP | 5199-5225 |
| 169 | Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation | 5301-5395 |
| 169-3 | Declaration of Daniel A. Small in Support of Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation | 5407-5413 |
| 169-4 | Supplemental Declaration of Charles Marr Regarding Notice and Administration | 5414-5448 |
| 169-15 | E-mail Chain Between Christopher Andrews and Class Counsel | 5737-5747 |
| 169-16 | Email from Christopher Andrews to E. Powell Miller | 5748-5749 |

| 181 | Response to Motion to Intervene for the Limited Purpose of Unsealing Records and Adjourning Fairness Hearing filed by MidMichigan Health (consolidated from 11-10375), Covenant Medical Center, Inc., Metropolitan Hospital, CHE Trinity, Michigan Health and Hospital Association, Bronson Health Care Group, Inc., University of Michigan Health System, Prime Healthcare Services - Garden City, LLC, McLaren Health Care Corporation, Health Alliance Plan of Michigan | 6130-6133 |
|---|---|---|
| 183 | Motion to Intervene by Alpena Regional Medical Center, Caro Community Hospital, Henry Ford Hospital, Henry Ford Macomb Hospital Corporation, Henry Ford West Bloomfield Hospital, Henry Ford Wyandotte Hospital, Henry Ford Health System, National Surgical Hospital, Oakwood Healthcare System, Oakwood Healthcare, Inc., Oakwood Annapolis Hospital, Oakwood Heritage Hospital, Oakwood Southshore Medical Center | 6135-6149 |
| 185 | Motion to Intervene in Response to Petitioners' Motion to Intervene for the Limited Purpose of Unsealing Records on Behalf of Third Parties Priority Health and Spectrum Health Systems by Priority Health Insurance Company, Spectrum Health Systems | 6152-6162 |
| 186 | Motion to Intervene by Holland Community Hospital | 6163-6172 |
| 189 | Notice of Objection to Motion to Unseal by Third Party Witnesses Acension Health and Borgess Health | 6177-6184 |

| 192 | Third-Party UnitedHealth Group, Inc.'s Motion to Intervene in Response to Petitioners' Motion to Intervene for the Limited Purpose of Unsealing Records | 6233-6242 |
|------|------|------|
| 201-4 | Transcript of Fairness Hearing, July 9, 2012 | 6490-6493 |
| 208 | Class Counsel's Opposition to Objector Christopher Andrews' Motion for Sanctions | 6659-6685 |
| 209 | Supplement to Objection, Supplement to Sanction Motion, Response to Class Counsel's Opposition to Sanctions Motion, filed by Christopher Andrews | 6907-6951 |
| 213 | Opinion and Order Regarding Fairness Hearing, Granting Motion for Attorneys' Fees, Reimbursement of Expenses and Payment of Incentive Awards, Denying Motions to Intervene, Granting Motion for Final Approval of Settlement and Plan Allocation, Denying Motion to Strike Sur-Reply, and Denying Motions for Sanctions | 6969-7017 |